# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,*<br>ROBERT WALKER<br>5225 Pooks Hill Road #1602S<br>Bethesda, MD 20814<br><br>     Plaintiff-Relator,<br><br>BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA,<br><br>UNITED STATES ATTORNEY<br>36 South Charles Street<br>Baltimore, MD 21201<br><br>ATTORNEY GENERAL OF<br>THE UNITED STATES<br>U.S. Department of Justice<br>950 Constitution Avenue, N.W.<br>Washington, DC 20530<br><br>v.<br><br>MULTIPLAN, INC.<br>2273 Research Boulevard,<br>Rockville, MD  20850<br><br>MULTIPLAN SERVICES CORPORATION<br>115 5th Avenue,<br>New York City, New York  10003<br><br>MULTIPLAN CORPORATION<br>115 5th Avenue,<br>New York City, New York  10003<br><br>VIANT, INC.<br>535 East Diehl Road<br>Naperville, IL 60563<br><br>VIANT PAYMENT SYSTEMS, INC.<br>535 East Diehl Road<br>Naperville, IL 60563 | No. _____<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**COMPLAINT**<br><br>FILED **UNDER SEAL**<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)<br><br>**JURY TRIAL DEMANDED** |

1

Defendants.    )
                          )
                          )

## COMPLAINT

1. This is an action filed under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, by Plaintiff-Relator Robert Walker in the name of the United States and himself to recover penalties and damages arising from illegal activities committed by Defendants related to false claims and money owed to government health care service providers.

2. The Plaintiff-Relator provides details regarding the Defendants' scheme to discount insurance company payments for government run health care service providers. The health care service providers operated by the U.S. Department of Veterans Affairs and the Department of Defense lost money owed to them through discounts that were obtained through misrepresentations, false statements, and efforts to avoid obligations to the government.

3. In addition, the Defendants obtained through misrepresentations and false statements improper discounts for private insurance companies when Medicare or Medicaid paid as the primary insurer for patients who had private health insurance.

4. Any discount obtained on charges owed to government facilities for the provision of health care based upon any such a fraudulent scheme is a violation of the Federal False Claims Act.

## JURISDICTION AND VENUE

5.  This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

6.  This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

7.  Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants regularly transact business in this District, and did so at all times relevant to this Complaint. One or more, if not all, of the Defendants also maintain offices within this jurisdiction at 2273 Research Boulevard, Rockville, MD  20850. Furthermore, the False Claims Act confers nationwide jurisdiction.

8.  There has been no public disclosure of the allegations contained in this Complaint.

9.  Robert Walker is the original source of the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B).

10. Mr. Walker has independent knowledge of all the information contained herein, and Mr. Walker has voluntarily provided such information to the government of the United States prior to filing this action.

## PARTIES

11. Plaintiff-Relator Robert Walker, of 5225 Pooks Hill Road, #1602S, Bethesda, Maryland 20814, is currently a Patient Accounting Manager at a private Surgery Center.

12. Previously, the Defendants employed Mr. Walker for more than ten years as an insurance claims negotiator. He began working for Concentra Preferred Systems and continued working for that company after it became known as Viant.  He continued to work for the organization after MultiPlan acquired Viant.

3

13.   Defendants Viant, Inc., and Viant Payment Systems, Inc. (hereinafter, "Viant") of 535 East Diehl Road
      Naperville, IL 60563, and located at 2273 Research Boulevard, Rockville, MD 20850, are collectively referred to herein as "Viant." Viant was also previously known as Concentra Preferred Systems.

14.   Defendants MultiPlan, Inc., MultiPlan Services Corporation and MultiPlan Corporation (hereinafter, "MultiPlan"), of 115 Fifth Avenue New York, NY 10003, and located at 2273 Research Boulevard, Rockville, MD 20850, are collectively referred to herein as "MultiPlan."

15.   MultiPlan completed acquisition of Viant in the first quarter of 2010.

16.   Viant and MultiPlan employ negotiators in offices including but not limited to Rockville, Maryland; Naperville, Illinois; and Salt Lake City, Utah.

17.   The Plaintiff-Relator worked for both Viant and MultiPlan in two offices in Rockville, MD, including MultiPlan's current location of 2273 Research Boulevard, Rockville, MD 20850.

18.   The organizations doing business as Viant and MultiPlan operate as adjusters of medical insurance claims.  The Defendants refer to themselves as "negotiators," but as will soon be apparent, the Defendants actually conduct very few real negotiations in their course of business with the Department of Veterans Affairs and Department of Defense health service providers.

19.   Viant and MultiPlan handle claims on behalf of their client insurance companies including:

      Aetna, Inc., Rt-52, 151 Farmington Avenue, Hartford, CT 06156
      Cigna, Inc., 1601 Chestnut Street, Philadelphia, PA 19182

Golden Rule Insurance, 7449 Woodland Drive, Indianapolis, ID 46278
Health Net, Inc., 21650 Oxnard Street, Woodland Hills, CA 91267
Humana, Inc., 500 West Main Street, Louisville, KY 40202
MVP or Mohawk Valley Physicians Health Plan, Inc.,
    595 Broadway Waterville, NY 12189
Mutual of Omaha, Omaha Plaza, Omaha, Nebraska 68175
PacifiCare, 280 N. Montebello Blvd., Suite 102 Montebello, CA 90640
United Health Care, 4 Taft Court, Rockville, MD 20850

## FACTUAL ALLEGATIONS

### A.    Introduction

20. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

21. For approximately 20 years, Concentra Preferred Systems, Viant, and MultiPlan have been working to reduce the amount of money their insurance company clients pay in claims to health care service providers.

22. Defendants settle claims with service providers, including service providers that receive federal funding. Specifically, these companies reduce the amount paid to providers and facilities funded by the United States Department of Veterans Affairs, ("VA") and the Department of Defense.

23. Such facilities are allowed to accept lower payments for services under the applicable laws and regulations governing the compromise and collection of debts.

24. However, Defendants knowingly make false statements to health care providers and misrepresent the state of claims that are owed, thereby underpaying on debts.

25. The Defendants make false statements, discount the amount owed to the providers, and avoid obtaining agreements from an appropriate authority to compromise a debt owed to the United States.

26.   Defendants take these fraudulent actions with the intent of reducing significantly the amount of the payments that are owed to the VA and military facilities, which results in Defendants defrauding the government from receiving the amounts to which it is legally entitled.

27.   The VA and the Department of Defense provide health care to many people who have private insurance, and they charge private insurance companies when appropriate.  For example a veteran has private insurance as a result of obtaining employment after service in the military and seeks care at a VA facility. Private insurance is the primary insurer and is supposed to pay for treatment at these facilities for their beneficiaries.

28.   As a result, private insurers regularly receive claims for treatment from VA and military health care service providers. The Defendants are hired by the private insurers to reduce the amount those insurance company clients pay health care providers.

29.   However, the Defendants go beyond what is legally permissible. The Defendants engage in the systematic fraudulent scheme described herein with the intent of lowering the amount of payments to the government that are owed for medical services.

30.   VA and military service providers are entitled to full payment for their services. As United States government facilities, these service providers have fixed reimbursement rates for their services. There is no reason to reduce payments once the treatment has been verified and the claim substantiated.

31.   This is the point when the Defendants' negotiator begins attempts to lower the payments through a fraudulent scheme.

32.   The Plaintiff-Relator alleges herein many specific examples of the Defendants' own claim reviews that state, "there is no issue on this claim" or similar statements, yet the Defendants still attempt to obtain discounts from government service providers.

33.   Negotiators employed by the Defendants contact individual service providers on behalf of the client insurance companies in an effort to persuade the provider to accept vastly reduced payments for claims.

34.   Each of the claims has already been approved and verified at the time of the contact. The information is fully provided to the Defendants including the full amount of the liability prior to any contact with the provider. Accordingly, there is nothing in dispute about the kind of claim or even the legitimacy of the claim when the negotiators contact the provider.

35.   Using dishonest tactics on a systematic, continuing, and ongoing basis, employees of Defendants have succeeded and continue to succeed in reducing payment amounts by large percentages.

36.   In addition, Medicare and Medicaid are supposed to be secondary payers of health insurance claims for veterans with private health insurance plans. Sometimes, Medicare and Medicaid erroneously pay claims as if they were the primary insurers for veterans with private insurance.

37.   The Defendants defrauded Medicare and Medicaid when those agencies paid claims in error. The Defendants knowingly failed to notify and reimburse the government when their client, as the primary insurer, was supposed to pay the claim.

38.   The Plaintiff-Relator provides specific examples of the techniques employed by the Defendants to obtain discounts.

39.   Specific examples are presented in in sections E, F, G, and H below demonstrate common techniques used by the Defendants to discount claims including:

> Documented adjustments Falsely Presented by Defendants As If They Are Based Upon a DRG Code;
>
> Documented Adjustments Completed That Viant And Multiplan Do Not Justify Or Support;
>
> Offers For Claim Sent With No Justification To Support The Discount;
>
> Claims Paid By Medicare Or Medicaid When An Insurance Company Primarily Is Liable.

40.   The Defendants employ additional techniques such as "signature to follow" for which they do not necessarily even confirm if a signature is obtained.

41.   Each technique provides the Defendants with a way to obtain a large discount on a legitimate claim from a government health care provider and do so quickly.   These techniques are used to avoid a real evaluation of what the claim should be worth based on applicable regulations and evade appropriate authority to discount a government claim or a debt owed the government.

42.   Misrepresentations by Defendants to improperly lower claims paid to the VA and military facilities and to charge Medicare and Medicaid violate the Federal False Claims Act, 32 U.S.C. § 3729(a)(1)(A), (B), (D) and (G), for making false claims and knowingly and improperly decreasing an obligation to pay money to the government and for creating false statements and false records to do so.

**B.   Applicable Laws And Regulations**

43.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

8

44.   Charges for health care services are "debts" or "claims" to the United States under the
law:

> In subchapter II of this chapter and subsection (a)(8) of this section, the
> term "claim" or "debt" means any amount of funds or property that has
> been determined by an appropriate official of the Federal Government to
> be owed to the United States by a person, organization, or entity other than
> another Federal agency. A claim includes, without limitation—
>
> (A) funds owed on account of loans made, insured, or guaranteed by the
> Government, including any deficiency or any difference between the price
> obtained by the Government in the sale of a property and the amount owed
> to the Government on a mortgage on the property,
>
> (B) expenditures of nonappropriated funds, including actual and
> administrative costs related to shoplifting, theft detection, and theft
> prevention,
>
> (C) over-payments, including payments disallowed by audits performed
> by the Inspector General of the agency administering the program,
>
> (D) any amount the United States is authorized by statute to collect for the
> benefit of any person,
>
> (E) the unpaid share of any non-Federal partner in a program involving a
> Federal payment and a matching, or cost-sharing, payment by the non-
> Federal partner,
>
> (F) any fines or penalties assessed by an agency; and
>
> (G) other amounts of money or property owed to the Government.

*See* 31 U.S.C. § 3701(b)(1).

45.   Generally, agencies such as the VA and the Department of Defense can compromise a
debt, but not on the basis of fraud, misrepresentation or even mistake:

> (a) The head of an executive, judicial, or legislative agency—
>
> (1) shall try to collect a claim of the United States Government for money

or property arising out of the activities of, or referred to, the agency;

(2) may compromise a claim of the Government of not more than $100,000 (excluding interest) or such higher amount as the Attorney General may from time to time prescribe that has not been referred to another executive or legislative agency for further collection action except that only the Comptroller General may compromise a claim arising out of an exception the Comptroller General makes in the account of an accountable official; and

(3) may suspend or end collection action on a claim referred to in clause of this subsection when it appears that no person liable on the claim has the present or prospective ability to pay a significant amount of the claim or the cost of collecting the claim is likely to be more than the amount recovered.

(b)

(1) The head of an executive, judicial, or legislative agency may not act under subsection (a)(2) or (3) of this section on a claim that appears to be fraudulent, false, or misrepresented by a party with an interest in the claim, or that is based on conduct in violation of the antitrust laws.

…

(c) A compromise under this section is final and conclusive unless gotten by fraud, misrepresentation, presenting a false claim, or mutual mistake of fact. An accountable official is not liable for an amount paid or for the value of property lost or damaged if the amount or value is not recovered because of a compromise under this section.

(d) The head of an executive, judicial, or legislative agency acts under—

(1) regulations prescribed by the head of the agency; and

(2) standards that the Attorney General, the Secretary of the Treasury, may prescribe.

*See* 31 U.S.C. § 3711. *See also* 31 U.S.C. § 3720 (providing authority to the Secretary of an Agency to compromise debts).

10

46.   Agencies can promulgate regulations to manage such debts. For example, pursuant to this statutory authority the VA has regulations to handle the collection and compromise of debts and claims under strict controls.

47.   These regulations may allow the insurance companies to pay less than the amount of the claim, but only if they can justify such a compromise of a debt payment within specified limits:

> A third-party payer liable under a health plan contract has the option of paying either the billed charges described in this section or the amount the health plan demonstrates is the amount it would pay for care or services furnished by providers other than entities of the United States for the same care or services in the same geographic area. If the amount submitted by the health plan for payment is less than the amount billed, VA will accept the submission as payment, subject to verification at VA's discretion in accordance with this section. A VA employee having responsibility for collection of such charges may request that the third party health plan submit evidence or information to substantiate the appropriateness of the payment amount (e.g., health plan or insurance policies, provider agreements, medical evidence, proof of payment to other providers in the same geographic area for the same care and services VA provided).

*See* 38 C.F.R. § 17.101(a)(4).

48.   However, the Defendants did not attempt to comport with the minimal requirements of this regulation or the requirements of other regulations governing the VA's established procedures for the compromise of debts or payments to medical service providers.

49.   The evidence shows that the Defendants do not base their offers on an analysis of similar services in the geographic area, but rather on the percentage discount they can obtain.

50.   The Defendants also skirt the appropriate authority to grant such a compromise of VA charges. VA regulations put jurisdiction for claims related to the provision of health care services under the authority of regional Office Committees on Waivers and Compromises:

> (a) The regional office Committees are authorized, except as to

determinations under § 2.6(e)(4)(i) of this chapter where applicable, to consider and determine as limited in §§ 1.955 et seq., settlement, compromise and/or waiver concerning the following debts and overpayments:

…

2) Arising out of operations of the Veterans Health Services and Research Administration:

(i) Debts resulting from services furnished in error (§ 17.101(a) of this chapter).

(ii) Debts resulting from services furnished in a medical emergency (§ 17.101(b) of this chapter).

(iii) Other claims arising in connection with transactions of the Veterans Health Administration (§ 17.103(c) of this chapter).

(iv) Fiscal officers at VA medical facilities are authorized to waive veterans' debts arising from medical care copayments (§ 17.105(c) of this chapter).

*See* 38 C.F.R. § 1.956.

51.   The composition and authority of such Committees is also set forth by regulation:

(a) Delegation of authority and establishment.

…

(2) There is established in each regional office, A Committee on Waivers and Compromises to perform the duties and assume the responsibilities delegated by § 1.956 and §1.957.

(b) Selection. The Director shall designate the employees to serve as Chairperson, members, and alternates. Except upon specific authorization of the Under Secretary for Benefits, when workload warrants a full-time committee, such designation will be part-time additional duty upon call of the Chairperson.

(c) Control and staff. The administrative control of each Committee on Waivers and Compromises is the responsibility of the station's Fiscal Officer. However, the station Director has the authority to reassign the administrative control function to another station activity, rather than the Fiscal Officer, whenever the Director determines that such reassignment is appropriate. The quality control of the professional and clerical staff of the Committee is the responsibility of the Chairperson.

(d) Overall control. The Assistant Secretary for Management is delegated complete management authority, including planning, policy formulation, control, coordination, supervision, and evaluation of Committee operations.

(e) Committee composition.

(1) The Committee shall consist of a Chairperson and Alternate Chairperson and as many Committee members and alternate members as the Director may appoint. Members and alternates shall be selected so that in each of the debt claim areas (i.e., compensation, pension, education, insurance, loan guaranty, etc.) there are members and alternates with special competence and familiarity with the program area.

(2) When a claim is properly referred to the Committee for either waiver consideration or the consideration of a compromise offer, the Chairperson shall designate a panel from the available Committee members to consider the waiver request or compromise offer. If the debt for which the waiver request or compromise offer is made is $20,000 or less (exclusive or interest and administrative costs), the Chairperson will assign one Committee member as the panel. This one Committee member should have experience in the program area where the debt is located. The single panel member's decision shall stand as the decision of the Committee. If the debt for which the waiver request or compromise offer is made is more than $20,000 (exclusive of interest and administrative costs), the Chairperson shall assign two Committee members. One of the two members should be knowledgeable in the program area where the debt arose. If the two member panel cannot reach a unanimous decision, the Chairperson shall assign a third member of the Committee to the panel, or assign the case to three new members, and the majority vote shall determine the Committee decision.

*See* 38 C.F.R. § 1.955, Regional office Committees on Waivers and Compromises.

52.   The Defendants' use of misrepresentations as well as documented adjustments show no effort to seek the appropriate authority at a VA or military service provider to compromise a debt.

53.   Indeed, in the many examples provided by the Plaintiff-Relator there is no evidence of an appeal to such a Committee.

54.     The only authority apparently within the purview of a VA Fiscal Officer, acting on his or her own without the authority of a Committee, is to waive co-payments required from the veteran, not the authority to grant compromises of debts owed by insurance companies.

55.     The entire purpose of the documented adjustment procedure used by the Defendants and described below is to avoid obtaining actual approval from an appropriate authority.

56.     In addition, the VA regulations require approval from two members of the Committee for any discount on a debt of an amount over $20,000.   The Plaintiff-Relator's examples show numerous specific cases of discounts involving debts of more than $20,000 that are not approved by anyone much less two members of a Committee.

57.     Even lesser amounts are subject to much greater control than the Defendants allow the VA to exercise:

> Any offer to compromise or settle any charges or claim for $20,000 or less asserted by the Department of Veterans Affairs in connection with the medical program shall be referred as follows:
>
> (a) To Chiefs of Fiscal activities. If the debt represents charges made under § 17.101(a), the compromise offer shall be referred to the Chief of the Fiscal activity of the facility for application of the collection standards in § 1.900 et seq. of this chapter, provided:
>
> (1) The debt does not exceed $1,000, and
>
> (2) There has been a previous denial of waiver of the debt by a field station Committee on Waivers and Compromises.
>
> (b) To Regional Counsel. If the debt in any amount represents charges for medical services for which there is or may be a claim against a third party tort-feasor or under workers' compensation laws or Pub. L. 87-693; 76 Stat. 593 (see § 1.903 of this chapter) or involves a claim contemplated by § 1.902 of this chapter over which the Department of Veterans Affairs lacks jurisdiction, the compromise offer (or request for waiver or proposal to terminate or suspend collection action) shall be promptly referred to the field station Regional Counsel having jurisdiction in the area in which the claim arose, or
>
> (c) To Committee on Waivers and Compromises. If one of the following

situations contemplated in paragraph (c)(1) through (3) of this section applies

(1) If the debt represents charges made under § 17.101(a), but is not of a type contemplated in paragraph (a) of this section, or

(2) If the debt represents charges for medical services made under § 17.101(b), or

(3) A claim arising in connection with any transaction of the Veterans Health Administration for which the instructions in paragraph (a) or (b) of this section or in § 17.105(c) are not applicable, then, the compromise offer should be referred for disposition under § 1.900 et seq. of this chapter to the field station Committee on Waivers and Compromises which shall take final action.

*See* 38 C.F.R. § 17.103.

58.     This regulation makes clear that amounts over $1,000 must be referred to the Committee prior to any individual Fiscal Officer making a determination on an action by the Committee. No individual can waive claims asserted by the VA for medical charges generally:

> Applications or requests for waiver of debts or claims asserted by the Department of Veterans Affairs in connection with the medical program generally will be denied by the facility Fiscal activity on the basis there is no legal authority to waive debts, unless the question of waiver should be referred as follows:
>
> (a) Of charges for medical services. If the debt represents charges made under § 17.102, the application or request for waiver should be referred for disposition under § 1.900 et seq. of this chapter to the field facility Committee on Waivers and Compromises which shall take final action…

*See* 38 CFR § 17.105, Waivers.

59.     A request for a waiver is only appropriate after the Committee has taken some action in any case.

60.     There is no evidence the Defendants attempted to request a waiver or attempted to seek a compromise from the Committee. Indeed, their efforts were to circumvent all authority.

**C.     Defendants Use Deceptive Techniques To Discount Payments**

61.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

62.   The way individual adjusters approach claims from government health providers is guided by company training.

63.   Individual employees are provided with written scripts.

64.   They use sophisticated databases to track information on individual government officials who may be gullible or susceptible to trickery.

65.   This allows an employee to anticipate to what extent it might be possible to persuade a government employee to accept reduced payments without having to justify the lower payments.

66.   The adjusters know in advance how large a discount to try to obtain based on the company's track record with a particular official, and or particular facility. They make their offer based on that track record rather than based on a justification permissible by law or regulation.

67.   Discounts are not based on any legitimate valuation of the claim. Most importantly, the negotiators engage in dishonest tactics and make false statements to obtain discounts for their clients.

68.   The evidence shows the Defendants' only concerns are to close accounts at the lowest possible price and to do so as quickly as possible.

69.   One technique to accomplish this is to handle matters as a "documented adjustment."

70.   In a documented adjustment there is no meeting of the minds between negotiators and any representative of the VA or military facility.

71.  The Viant documented adjustment policy, which the Plaintiff-Relator had access to via computer as "Documented Adjustments Policies and Procedures," defines this as a successful closure, "based on an agreement reached with the provider but the provider is unwilling to sign an agreement."

72.  Defendants use this procedure to avoid having to obtain consent as the "CPS" or Concentra Preferred System (Viant) Document Adjustment Guide explains:

> A successful closure happens when a Provider has agreed to a rate on a claim, but will not sign an agreement with CPS. A Negotiator is responsible for checking the Client Notes in BEACON[1] and their Negotiator Desk Reference to see if the Client will allow Documented Adjustments. The Negotiator must seek manager approval for the adjustment.

73.  The "client" referred to in this policy is not the medical facility. It is the insurance company who hires the Defendant to lower the amount payable on the claim.

74.  Whether the "client" agrees with such a negotiation or not has no bearing on whether the government agency has agreed to the deal. In many cases government employees will refuse to sign an agreement, yet the Defendants proceed as if that is an indication of an agreement.

75.  Scripts used by the negotiators state to officials in phone conversations that they have a "recommended allowable" but will provide a slightly higher "initial offer."

76.  This technique is used to make it seem that the discount is reasonable or based on some fair reading of what should be paid.

77.  In reality it is based on what the negotiator wants to pay.

---

[1] BEACON was the program used by individual negotiators to see the numbers and claims on the internal computer systems of the negotiator Defendants. "CPS" is Concentra Preferred Systems, the division of the Company's name prior to Viant.

78. A company policy memo includes four different kinds of documented adjustments each of which gives a negotiator the authority to change the amount of the claim, pay what the negotiator wanted to pay, and not bother with the formality of a written agreement.

79. The "CPS Documented Adjustment Guide" refers to one technique as a "DAM-Documented Adjustment for Miscellaneous reason." It provides this explanation:

> Definition: a Successful closure may still occur if the Negotiator is able to achieve savings on a case for miscellaneous reasons. An example would be as follows: The Negotiator contacts a VA Hospital and they agree to settle the balance on a case, but the provider contact is unable to sign an agreement. If our Client allows Documented Adjustments for VA Hospitals, the negotiator may be able to close the case successfully as a Documented Adjustment Miscellaneous.

80. The updated policy in Viant's "Documented Adjustment Policies and Procedures" provides similar language for a "Documented Adjustment for Miscellaneous Reason." It explains:

> Example: The negotiator contacts a VA Hospital and they agree to settle the balance of the case but are unable to sign an agreement. If our client allows Doc Adjs for VA Hospitals the negotiator may be able to close the Case DAM.

81. In practice, a documented adjustment ensures that the company simply pays what it wants to pay based on its own determinations.

82. The client, of course, is the insurance company.

83. The client's decision to allow a documented adjustment for a VA facility is not to be confused with the VA or any government agency agreeing to such a discount.

84. Viant also produced a manual of scripts for its negotiators to follow entitled "PNS Negotiation Scripts". Certainly, in the context of a government service provider, the scripts presented in that manual are fraudulent.

85. For example one script explains:

18

**Request Exception**

Negotiator:  My Goal is to help expedite the payment of this claim but I need your help to do that. Can you consider (<u>$0.00</u>) as an exception for this patient and date of service?

**Prompt Pay Discount**

Negotiator: I can offer a (X%) Prompt pay discount with check released in (X-X) Business days is that acceptable?

86.  These two simple scripts are fraudulent. First, the bill is due in a timely manner to VA and military health service providers. There is no extra consideration due the insurance company or its representative for prompt payment. Second, the Defendants' goal is not to expedite payment, but to reduce payment.

87.  That statement is simply a knowing deception. The insurance company is legally obligated to pay a clean claim within a designated time frame. In fact, the Defendants have a deadline to discount the claim or the file will be returned to the client insurance company for full payment.

88.  The client insurance companies automatically pay the claim in a specified number of days regardless of this process. The negotiator has no control over the timeliness of the payment. Any representation as to the timeliness of such a payment is simply false.

89.  A script designed for a negotiators dealing with a Veteran's Administration Facility leads to avoiding any agreement on the claim:

Negotiator:    I'm aware that you're a federal facility and are unable to sign my proposals.  (Client's Name) has allowed me to review this claim. My offer for this date of service is <u>$0.00.</u>  It's based on (<u>a multiplier times the DRG or, OPPS or APC factors.</u>)

*Provider Accepts.*

*Attempt Documented Adjustment-If allowed*

Negotiator:   I'll fax a Memo for your records that does not require a signature. The memo will have my phone number, details of our conversation and the expected reimbursement.  Please call me within 48 hours if you have questions.

90.   As alleged in the preceding paragraph, the Defendants' script pretends to be dealing with the special status of the VA as a federal government facility.

91.   However, the Defendants' script is an effort to circumvent approval of the claim by the person on the other end of the phone. It is an attempt to allow the offer to proceed and discount the payment.

92.   The amount that will be presented on the memo is actually an adjusted charge that is not even necessarily the final "expected reimbursement."

93.   That number can be subject to co-payments and other deductions in the fine print that the government employee may never be told about on the phone.

94.   The actual offers presented by the negotiators were based on what the Defendants wanted to pay. References to the DRG (diagnosis-related group) if made at all are employed as a tool to convince the government not to investigate what a fair payment of the claim would be.

95.   The Defendants' documented adjustment procedure avoids the necessity of dealing with appropriate authority within the VA since a verbal agreement is all that is obtained and it cannot be verified that the appropriate person approved anything.

96.   The Plaintiff-Relator maintains that even when negotiators obtain a signed agreement they do so by misrepresenting facts about the claims. The Defendants set a target amount before calling, using the history of discounts taken on amounts due to the particular provider.

97.  That is the basis upon which the Defendants attempted to lower payments, and not a reference to private providers in the geographic area.

98.  The Viant policies attempt to deal with the special status of the VA. One policy entitled "Veterans Administration Facility Claims Policy and Procedures" starts with an understanding of the law but quickly allows for the negotiators to make up whatever charges they want:

> VA facilities will accept as payment for their charges what commercial carriers reimburse, based on "reasonable determinations" by the payer, VA regulations will permit recourse, for what they believe to be inappropriate reimbursement, by appealing to the commercial payer and asking for information to substantiate the appropriateness of the payment amount. (e.g. Health plan or insurance policies, provider agreements, medical evidence, proof of payment to other providers in the same geographic area for the same care and services VA provided.) *VA personnel do not accept "negotiating" as an acceptable solution for determination of "reasonable" allowable payment for services.*

> When reviewing a VA inpatient case you will notice the simplicity of the billing detail.  These claims will include a charge for the daily room-and-board and associated ancillary charge per diem. It can be difficult to determine to what extent specific services were provided or the acuity of care all-important factors when evaluating and calculating charge allowable.  What is critical when approaching these facilities is to be consistent, be aware of their CPS history, and document your interaction in detail.

99.  In practice, the Defendants do not try to determine what specific services were provided.

100.  Indeed, there is no amount or charge in dispute when they begin negotiating. Instead, they base their offers not on what they are allowed to charge, but rather on what they have gotten away with charging in the past without any further justification and without regard to the legal requirements.

101.  The updated Viant "VA Claims Policy & Procedure," while generally more stringent, also admits that the Viant negotiates claims with the VA stating:

> A VA provider is a government owned and operated facility. When negotiating VA Claims, it's the policy of Viant to ensure the Adjusted Price presented to the provider is both defensible and adequately documented.

102.  While these policies that were adopted by Defendants pretend to deal with the special status of government health care providers, in practice the negotiators are able to obtain documented adjustments of claims without a written any written agreement from any appropriate authority using this technique.

**D.    Individual Employees Are Put Under Pressure By Defendants To Lower Payments**

103.  In the Plaintiff-Relator's experience, the Defendants put their individual employees, the individual negotiators, under intense pressure to close claim files and reduce payments to health service providers including Defense Department and VA health service providers.

104.  The Plaintiff-Relator was required to handle as many as 1,000 health service claims a month. Management constantly applied pressure by raising quotas for the number of claims handled per month and the dollar amounts saved.

105.  Viant requires an individual negotiator to close a few dozen claims every day.

106.  The individual negotiators and their managers work on a base plus commission basis, with the commission providing the clear incentive to obtain reduced payments on claims.

107.  The incentive to minimize payments and close claims runs all the way to the corporate executive level as the negotiator companies themselves are also paid on a commission basis.

108.  There are internal programs with names like "beat the comps" which also provide bonuses for individuals to obtain larger discounts if they succeed in implementing the fraudulent scheme to reduce payments to providers including the VA and the Department

of Defense. MultiPlan and Viant continually monitor their employees' abilities to lower payments to all providers on behalf of the insurance companies.

109. The individual negotiators handle claims for both private providers and for government service providers. They are trained to get the lowest amount possible at all times without regard to justifying this conduct regardless of the provider's status as a private or government facility.

110. In particular, the negotiators were urged to use "documented adjustments" to handle VA claims.

111. This tactic makes it possible for the Defendants to settle claims without anybody at the VA or military health care service provider being required to sign that they agree with the discount on the claim.

112. It also makes it possible for negotiators to close the claim fast and say *anything* about the claim over the phone. Then the negotiator would close the case.

113. Often the documentation would include no analysis of how the negotiator created the amount to offer. The only real goal of the offer was to reduce the payment. If the offer was based on any analysis at all it was what percentage a particular government health care provider might have previously unwittingly "accepted" as a discount on claims.

114. On lower dollar value claims, the negotiators would simply fax or email any suggested amount they wished to the government service provider.

115. The provider might agree to large percentage discounts without realizing there was no reason to accept such an offer.

116.   MultiPlan and Viant employees learned to close these transactions fast and for the lowest amount possible. They employed many fraudulent techniques discussed herein to achieve those discounts.

**E.     Offers For Claims Sent With No Justification To Support The Discount**

117.   This kind of "negotiation" occurs quite frequently on claims involving low dollar amounts, or outpatient charges. The percentage savings to the negotiator and the insurers can be very high. Offers for these claims are sent out via fax or email without so much as a call or a cursory analysis. The Defendants can process many claims quickly and also obtain many high percentage discounts.

118.   While the service provider may sign off on these kinds of claims, the government is entitled to assume that Viant or MultiPlan is basing an offer on something that comports with a regulation or a demonstration that it is a fair payment.

119.   The evidence shows these kinds of claims are reduced based on what negotiators have been able to obtain as a discount from the provider previously, and on their ability to pay less. For example, a negotiator working for Viant obtained a discount signed on June 15, 2009 from the VA Medical Center in Temple, Texas.  The claim was for $6,991.99 and Viant took a discount of $2,401.99, which was 34.35%. The negotiator obtained this discount without any demonstration that the amount was related to a private provider in the geographic area or indeed without any analysis related to any fair payment. The negotiator simply provided an offer to pay the VA's claim and somebody at the VA, acting in good faith, assumed that the negotiator was presenting a legitimate offer.

120.   Viant did not present a legitimate offer.

121.   Indeed, the percentage discounts obtained by Defendants alone are suspect. The Defendants also obtained a discount of 60.04% on a charge of $635.64 from the same VA on April 28, 2009. In this case, again the claim was simply faxed with no justification to support a discount.

122.   The Plaintiff-Relator has provided evidence from this particular VA facility, which includes discounts taken by the Defendants in this way that range from 20%-60%.

123.   This pattern is an additional indication that the Defendants understand what and how much they can get away with from this VA hospital so the Defendants prey upon it.

**F.   Documented Adjustments Falsely Presented By Defendants As If They Are Based Upon A DRG Code Or Legitimate Source**

124.   The Defendants' practice is to mention the DRG as a negotiating tool, but that is intentionally deceptive. The reality is that the negotiator is offering only what the Defendant wishes to pay. The discount is really based upon whatever the negotiator thinks can be obtained.

125.   In these cases it is common for the service provider to be on record as stating that they do not negotiate or discount claims.  Such notes are constantly found in the Viant and MultiPlan system, but the Defendants' negotiators will use documented adjustments so that they do not have to obtain a signed agreement from the VA or military service provider.

126.   On January 30, 2009, Viant obtained a discount from the New York Harbor VA in Brooklyn.  The charges were for $82,014.55 but the negotiator obtained a discount of $16,402.91, which is a flat 20% of the total charges. The notes in the file do make reference to the DRG, but state, "I offered about 19X the DRG."

127.   This VA did not agree to this discount on their charges for services. The VA representative, according to the individual negotiator's notes, stated, "they accept what the insurance pay." The fact that the VA does not balance bill the patient, which was specifically discussed in this case, gives the negotiator an extra advantage with the VA officials. No individual patient will complain about the discount and that emboldens the negotiators.

128.   The stated offer of 19X the DRG is cover language in the notes and is not how the negotiator came up with the discount taken from the VA. The offer was based on the simple desire to take a 20% discount on the claim.

129.   On April 8, 2009 the Defendants took a discount from a claim by the Albuquerque, New Mexico VA.

130.   The charge presented in the file was for $567,174.00 and the negotiator took a discount of $113,434.80 or 20%. The negotiator notes say, "Based on DRG I am recommending payment increased to 80% of list price LP." There was no further analysis on file as to how the negotiator determined a 20% discount was appropriate.

131.   The practice was to determine the discount in advance and sell it to the VA thereafter. The insurer in this case had already determined it would pay 100% of the list price and informed the Defendant of that fact.

132.   That is evidence that a price based on what the geographic area would command at a private facility as required by the VA regulation is higher than the negotiator paid.

**G.      Documented Adjustments Completed That Viant And Multiplan Do Not Justify Or Support**

133.    In these cases it is common for the government provider to have already been on record in the negotiator's computer system as stating that they do not negotiate or discount the claim and or do not want to be contacted by the Defendants.

134.    If the amount is large enough the negotiator will attempt and achieve a discount by way of a documented adjustment. However, they often do not support the adjustment with any relevant documentation.

135.    On July 17, 2009 a claim from the Brook Adams Army Medical Base in Fort Sam Houston, Texas was discounted by 20%. This claim has charges of $13,079.54, and the discount amount is $2,615.91.

136.    The provider note about Brook Adams in the negotiator's computer system indicates, "They are a military facility and will never negotiate, they want to be on the DNC (do not contact) list."

137.    There is no analysis to support this 20% discount.   The negotiator's notes state the provider's employee asked for a memo for the record. Those notes also confirm the representative would not sign an agreement.

138.    On August 8, 2008, the Haley Veterans' Hospital in Tampa, Florida lost $2,719.50 as a result of a single discount. The negotiator took a 29.82% discount on a $9,119.50 bill.

139.    There is nothing in the claim to indicate that this discount is based on anything other than a desire to get a large discount.

140.    The Defendants will extract high dollar value discounts when the claim is for a relatively high amount owed. On June 6, 2008, the Haley Veterans' Hospital lost $24,321.65

because of a discount.  This claim is in the amount of $56,321.65, but the negotiator obtained a discount of 43.18%.

141.   There is no justification in the file to support this discount.

142.   On October 3, 2008, the VA Medical Center in Gainesville, Florida lost just less than thirty percent of a claim.  The amount of the claim is $10,712.75 and the negotiator took a discount of $3,212.75, which is 29.99%.

143.   There is nothing in the file to indicate that this discount is based on anything other than the desire to save money for the insurance company.

**H.     Claims Paid By Medicare Or Medicaid When An Insurance Company Is Primarily Liable**

144.   The Defendants save the insurance company money in these cases despite the fact that Medicare is a secondary payer of claim as stated by regulation:

> (a) Basic rules.
>
> (1) Medicare benefits are secondary to benefits payable by a primary payer even if State law or the primary payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries.
>
> (2) Except as provided in paragraph (b) of this section, Medicare makes secondary payments, within the limits specified in paragraph (c) of this section and in § 411.33, to supplement the primary payment if that payment is less than the charges for the services and, in the case of services paid on other than a reasonable charge basis, less than the gross amount payable by Medicare under § 411.33(e).

*See* 42 CFR § 411.32.

145.   In no way is Medicare to be treated as a primary payer of claims. Yet the Defendants treat it that way in order to make money. When this happens the discounts to the insurance company achieved by the Defendants can be an extraordinary percentage of the charge, because Medicare pays most of the bill.

146.    On September 2, 2008, this is exactly what happened on a claim owed to the Butler, Pennsylvania, VA.   The amount owed was $18,769.80, but the negotiator obtained a savings of $17,745.80, by not having Cigna pay, as the primary insurer should, and instead passing the bill on to Medicare.

147.    There are extensive notes on the case in the Defendant's file, which make it clear that the parties knew Medicare had paid and that they did nothing to inform Medicare that they represented the primary insurers.

148.    Excerpts from the negotiator's notes on this case state:

> PROV. STATES MEDICAE IS PRIMARY INS. CO., PER SANDY@ PROV. SHE STATES AMT. DUE FROM CIGNA IS ONLY $1,024. DUE TO IP BILL AND MEDICARE IS PRIME. PLEASE VERIFY WITH CL.

> REPLY FROM PAM STARZYK CLIENT SYSTEM SHOWS CIGNA PAYING PRIMARY ON THIS CLAIM.

> WILL CALL PROV. BACK AND LET THEM KNOW THAT CIGNA STATES THEY ARE PRIMARY-POSSIBLY DOC. ADJ.

> LEFT MESSAGE/VOICE MAIL: YES RE: CIGNA STATES THEY ARE PRIME.............POSSIBLY DOC AD. OR INL-COB..... [Ineligible coordination of benefits.]

> MANAGER ASSISTANCE: SHALL I CLOSE INL-COB OR SEEK APPROVAL FOR DOC ADJ??

> DOCUMENTED ADJUSTMENT APPROVED:: HI CONNIE-SINCE PROVIDER HAS INDICATED THAT MEDIARE IS THE PRIMARY CARRIER BUT CIGNA HAS CONFIRMED THEY ARE IN FACT PRIMARY, I BELIEVE PURSUIT OF A DOCUMENT ADJUST CLOSURE WOULD BE APPROPRIATE. PLEASE SEEK APPROVAL FROM ZACH SMITH-THANKS

> GENERAL NOTE: APPROVED

149.    The individual negotiator raised the relevant issue to management in this case.

150.   That individual stated "POSSIBLY DOC AD. Or INL-COB" using the code language designating a claim as ineligible for a discount, because of "coordination of benefits." She noted that Cigna was the primary insurer on the claim.

151.   Despite the negotiator flagging the issue, managers approved the discount and the case was closed as a documented adjustment.

152.   The Defendants realized a discount of over 90% on the case by deceiving the VA and billing Medicare. The claim should have been closed as INL-COB, meaning ineligible for discount based on a discrepancy between insurance company and the VA as to which insurer was primary. The claim should have been returned to the insurer with no adjustment.

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

### COUNT I

### (Violations of 31 U.S.C. § 3729(a)(1)(A)
### Submitting and or causing the submission of False Claims)

153.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

154.   This is an action for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

155.   As set forth above, Defendants Viant and MultiPlan knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the discounting of insurance claims made by the VA and Department of Defense health care service providers.

156. The Defendants misrepresented the state of the claims, avoided presenting their offers on the claims to an appropriate authority to compromise a debt or a claim and took discounts when there was no agreement by the health care service provider regarding the claim.

157. They also induced government insurers such as Medicare to pay for services when their client insurance company was the primary insurer.

158. In so doing they violated numerous regulations and statutory authority designed to protect these agencies, safeguard the government's ability to collect a debt for services, and protect agencies from being a primary insurer.

159. In carrying out these wrongful acts, the Defendants engaged in a protracted course and pattern of fraudulent conduct material to false claims for payment or approval that Defendants presented or caused to be presented to the United States.

160. As a result of the Defendants' continuing and ongoing fraudulent and or illegal conduct, the United States has directly or indirectly paid false claims for Medicare costs for patient services and lost money on payments owed to the government.

161. By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

162. Damages to the United States are continuing and ongoing, and include, but are not limited to, the full amount it has paid on any such fraudulent claims and lost as a result of such false claims.

163. Each Defendant is liable to the United States for three times the full amount of these damages.

164. Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of Five thousand Five Hundred Dollars to Eleven Thousand Dollars ($5,500-

$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

## COUNT TWO

**(Violations of 31 U.S.C. § 3729(a)(1)(B)**
**Use of False Statements and False Certifications)**

165.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

166.   This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

167.   As set forth above, the Defendants knowingly made, and or caused to be made and, false statements and false records incident to claims made to government health care service providers including VA service providers and Department of Defense service providers.

168.   They also induced government insurers such as Medicare to pay for services when their client insurance company was the primary insurer.

169.   In so doing they violated numerous regulations and statutory authority designed to protect these agencies, safeguard the government's ability to collect a debt for services, and protect agencies from being a primary insurer.

170.   In carrying out these wrongful acts, the Defendants engaged in a protracted course and pattern of fraudulent conduct material to false claims for payment or approval that Defendants presented or caused to be presented to the United States.

171.   Defendants made numerous false statements to government employees as well as created false records to support their discounts.

172.   As a result of the Defendants' continuing and ongoing fraudulent and or illegal conduct, the United States has paid directly or indirectly or lost money on thousands of false claims.

173.   By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

174.   Damages to the United States are continuing and ongoing, and include, but are not limited to, the full amount it has lost on such fraudulent claims and the full amount it paid when it paid claims as a primary insurer, but the private insurance company client of the Defendants was the primary insurer.

175.   Each Defendant is liable to the United States for three times the full amount of these damages.

   Each and every such fraudulent claim, or statement is also subject to a civil fine under the False Claims Act of Five Thousand Five Hundred Dollars to Eleven Thousand Dollars ($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

## COUNT III

### (Violations of 31 U.S.C. § 3729(a)(1)(D), False Claims for Violations FDA and Government Agency Fines)

176.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

177.   Plaintiff-Relator seeks relief for damages created by the Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(D).

178.  Defendants violated and continue to violate 31 U.S.C. § 3729(a)(1)(D) by having possession or custody of money or property used, or to be used, by the government and knowingly delivering, or causing to be delivered, less than all of that money or property.

179.  The Defendants took discounts on legitimate claims or debts for health care services provided by government heath care facilities.

180.  They also did not inform government insurers such as Medicare when their client-private insurance company had the obligation to pay for services as the primary insurer.

181.  Defendants made material misrepresentations to government officials regarding these debts and intentionally avoided presenting information to appropriate government officials, thereby knowingly delivering less money to the government than they were required to deliver.

182.  In so doing they violated numerous regulations and statutory authority designed to protect these agencies, to safeguard the government's ability to collect a debt for services, and to protect agencies from being a primary insurer.

183.  In carrying out these wrongful acts, the Defendants engaged in a protracted course and pattern of fraudulent conduct of knowingly delivering or causing to be delivered less money to the government than should have been delivered.

184.  As a result of the Defendants' continuing and ongoing fraudulent and or illegal conduct, the United States has paid for health care services that it should not have paid and also not received money on payments owed to the government.

185.  By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

186. Damages to the United States are continuing and ongoing, and include, but are not limited to, the full amount it lost though the Defendants' actions.

187. Each Defendant is liable to the United States for three times the full amount of these damages.

188. Each and every such fraudulent claim, or statement is also subject to a civil fine under the False Claims Act of Five Thousand Five Hundred Dollars to Eleven Thousand Dollars ($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

## COUNT FOUR

**(Violations of 31 U.S.C. § 3729(a)(1)(G),**
**For not paying or decreasing payments of claims owed to the United States)**

189. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

190. Plaintiff-Relator seeks relief for damages created by the Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

191. Defendants violated and continue to violate 31 U.S.C. § 3729(a)(1)(G) by knowingly concealing material information, using a false record or statement material to an obligation to pay or transmit money, and/or knowingly and improperly avoiding and or decreasing an obligation to pay or transmit money to the government.

192. The Defendants took discounts on legitimate claims or debts for health care services provided by government heath care facilities.

193. They also did not inform government insurers such as Medicare when the private insurer had the obligation to pay for services as the primary insurer on claims.

194.  The Defendants made material misrepresentations regarding these debts to government officials and intentionally avoided presenting information to appropriate government officials, thereby knowingly and improperly avoiding or deceasing an obligation to transmit money or property to the government resulting from legitimate government claims.

195.  In so doing they violated numerous regulations and statutory authority designed to protect these agencies, to safeguard the government's ability to collect a debt for services, and to protect agencies from being a primary insurer.

196.  In carrying out these wrongful acts, the Defendants engaged in a protracted course and pattern of fraudulent conduct material to false claims for payment or approval that Defendants presented or caused to be presented to the United States.

197.  As a result of the Defendants' continuing and ongoing fraudulent and or illegal conduct, the United States has paid directly or indirectly false claims for Medicare costs and lost money on debts owed to the government.

198.  By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

199.  Damages to the United States are continuing and ongoing, and include, but are not limited to, the full amount it lost though the improper avoidance or decrease in any such obligation to pay.

200.  Each Defendant is liable to the United States for three times the full amount of these damages.

201.  Each and every such fraudulent claim, or statement is also subject to a civil fine under the False Claims Act of Five Thousand Five Hundred Dollars to Eleven Thousand Dollars

($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of himself, the United States, and all States listed herein request that judgment be entered in his favor and against Defendants as follows:

(a) That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*, and the counterpart provisions of the state statutes set forth above;

(b) That this Court enter judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(c) That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(d) That Plaintiff-Relator be granted a trial by jury;

(e) That Plaintiff-Relator, the United States, and the States listed herein be awarded pre-judgment interest;

(f) That the Plaintiff-Relator, be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d) and similar provisions of the Sate False Claims Acts listed herein.

37

(g) The United States, and the Plaintiff-Relator recover such other relief as the Court

deems just and proper

## JURY TRIAL DEMANDED

Plaintiff-Relator requests a trial by jury on all counts.

Respectfully submitted,

David Benowitz
Maryland Bar # 17672
Price Benowitz LLP
409 7th Street NW
Suite 200
Washington, DC  20004
Telephone:     (202) 417-6000
Facsimile:      (202) 664-1331
Email: David@pricebenowitz.com

David K. Colapinto
D.C. Bar #416390
Kohn, Kohn & Colapinto, LLP
3233 P Street, N.W.
Washington, D.C.  20007
Telephone:     (202) 342-6980
Facsimile:      (202) 342-6984
Email: dc@kkc.com
To be admitted *Pro Hac Vice*

Anthony C. Munter
D.C. Bar # 483823
Price Benowitz LLP
409 7th Street NW
Suite 200
Washington, DC  20004
Telephone:     (202) 417-6000
Facsimile:      (202) 664-1331
Email: Tony@pricebenowitz.com
To be admitted *Pro Hac Vice*

Attorneys for the Plaintiff-Relator

June 4, 2014